**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**

**v.**

**MALIK SMITH**
*Register #70080-066*
*FDC Philadelphia*

**CRIMINAL ACTION
NO.  21-385**

**O P I N I O N**

Defendant Malik Smith is charged with one count of being a felon in possession of ammunition, specifically 19 live rounds of 9-millimeter Luger ammunition, in violation of 18 U.S.C. § 922(g)(1).  He has filed two motions to suppress the firearm, his DNA, and all derivative evidence from the firearm and his DNA.  At a hearing the Government presented documentary and video evidence, and testimony from several law enforcement officers.  For the reasons that follow, Defendant's motion to suppress evidence of the firearm shall be denied, but his motion to suppress his DNA sample and evidence derived therefrom shall be granted.

**I.   BACKGROUND**[1]

Around 9:25 p.m. on August 13, 2020, Philadelphia Police Officers Clifford Gilliam and Kyle Smith observed a 2011 Nissan Maxima with an excessive window tint driving in Northeast Philadelphia, Pennsylvania.  The tint on the car's side and rear windows was so dark that the officers could not see into the vehicle.  Upon first observing the vehicle, Officer Smith checked the vehicle information in the Police computer terminal and learned that the car was registered to

---

[1] The following facts are taken from the evidence presented and admitted at the suppression hearing.  Where noted, certain facts are taken from the parties' briefs for background information.  *See, e.g.*, *United States v. Serrano*, 798 F. Supp. 2d 634, 636-37 (E.D. Pa. 2011) (considering facts alleged in briefs and evidence presented during a suppression hearing, though treating facts taken from briefs as unproved allegations included for background information).

1

a Sherrita Sharron Moore.  The officers activated the police cruiser's overhead lights and
signaled the driver, the Defendant, to pull over (Moore had permitted Defendant to borrow her
car that night).  After a few moments, the Defendant complied and pulled over on the 1600 block
of Dyre Street.  The area has a reputation for high crime and is dimly lit at night—there are, at
most, two streetlights.

       The officers stopped some distance behind the Defendant and directed him to, through
loudspeaker, to roll down the car's windows.  Once the Defendant complied, the officers got out
of their cruiser, briefly met in front of it and turned on their flashlights before approaching the
vehicle.  Officer Gilliam walked along the driver's side of the car, shining his flashlight into the
backseat area to determine if there were any occupants in the car aside from the driver.  During
his scan of the backseat area, Officer Gilliam did not observe a firearm or any other contraband
in the car.  Once he was a few feet away from the car, Officer Gilliam realized that the
Defendant was the sole occupant in the car.  Upon reaching the driver's window, he asked the
Defendant to produce a copy of his license and registration.  Defendant complied and behaved
normally; he did not exhibit any nervous or avoidant behavior.

       Meanwhile, Officer Smith walked alongside the passenger side of the car, scanning his
flashlight around the backseat area, then the front passenger seat, and finally back again to the
backseat area.  The second time that Officer Smith looked at the backseat area, he leaned to one
side (not crossing into the body of the car) and noticed an extended magazine for a firearm on the
car's floorboard, sticking out from under the front passenger seat.  He looked closer and saw the
tan handle of a gun bearing a "P80" stamp at the end of the gun's grip.  After noticing the
firearm, only moments after Officer Gilliam had asked Defendant for his license and registration,
Officer Smith made a motion to Officer Gilliam indicating that he had seen a gun and that

Officer Gilliam should handcuff the Defendant.  Officer Smith then came around to the driver's side to provide back-up to Officer Gilliam as he handcuffed the Defendant, removed him from his car and walked back to the cruiser.  Once Defendant was detained, Officer Smith returned to the car, opened the car door and recovered a tan Polymer 80, Model PF940V2 ghost-gun loaded with 19 rounds of 9-millimeter ammunition.

Defendant was arrested and charged by state authorities that same day and, at some point later, was transported to the Northeast Detective Division in Philadelphia.  Around 12:56 p.m. the next day, Philadelphia Police Detective Timothy McIntyre read the Defendant a *Miranda* warning.  He then asked Defendant a series of "yes" or "no" questions to confirm that Defendant understood his rights.  In relevant part, Detective McIntyre asked, "do you [inaudible] you have the right to remain silent, or do you just, or do you want to talk to me about why, basically why you're here?"  Defendant responding by shaking his head no.  Detective McIntyre clarified, "Okay, so um, so no, if you don't want me, if you want me, to remain silent you have to say 'yes' or 'no.'"  Defendant replied, "I just wanna go."  Detective McIntyre replied, "I hear ya, I know you're tired, been here a while, I'm trying to speed this up as quick as I can . . . and we'll speed this up for you."  Detective McIntyre asked once again, "do you want to remain silent or talk to me?"  Defendant now stated that he wished to remain "silent."  He then followed up, asking, "you don't want to talk to me about why you're here?"  Defendant once again shook his head, no.

Detective McIntyre moved on by asking, "do you want either to talk to a lawyer at this time or have a lawyer with you while we ask you any questions, do you understand that?"  Defendant responded "yes."  Detective McIntyre clarified this ambiguous question with a narrower one:  "do you want a lawyer here or do you want me to ask you some questions?"

Defendant replied, "I want a lawyer, I don't want to do this . . ." and complained about his

detention.  After a brief discussion, Detective McIntyre asked once again, "do you either want to

talk to a lawyer at this time or have a lawyer with you while we ask you any questions?"

Defendant replied, "No, I want a lawyer."  Detective McIntyre followed up, "You want a

lawyer? You don't want to talk to me?"  Defendant confirmed, "No, I want my lawyer."

Detective McIntyre questioned Defendant a final time:  "Do you want to remain silent at this

time? [Y]ou do not want to talk to me without a lawyer, is that correct?"  Both questions elicited

responses of "yes" from Defendant.

Sometime after 1:02 p.m. Defendant was then taken "downstairs."[2]  Detective McIntyre

testified that while he did not know for certain what happened after Defendant left the

interrogation room, he assumed that someone asked the Defendant if he wanted to provide

consent for a DNA sample and that Defendant agreed.  At 1:16 p.m., about 14 minutes after

Defendant invoked his right to remain silent and requested an attorney, Defendant was back in

the same interrogation room with Detective McIntyre to consent to a swab of his mouth for a

DNA sample, known as a "buccal swab."  During this 14-minute interval, Defendant was not

provided with a lawyer.  Nothing in the record suggests that he waived his invocation of his

rights to remain silent or to counsel.

Detective McIntyre began, "so this is going to speed up—in order not for us to get a

search warrant, this is a consent to search, I'm going to fill this out date and time, and my

[inaudible] is going to come in and swab your left cheek, right cheek, and under your tongue,

alright?"  He continued, "I'm going to need you to sign two things, your name, Malik Smith,

---

[2] The testimony and evidence are not clear as to when exactly Defendant was brought "downstairs," or what was
downstairs.  As of 1:02 p.m., when the video of the *Miranda* colloquy ends, Defendant was still in the interrogation
room.

your signature and today's date.  Got that?"  Defendant peered over to review the consent

document.  Detective McIntyre said:  "I'm going to read it all to ya, this is what's called a

consent to search.  You're providing us with consent to take your uh, swab of your mouth to

keep on file.  I'm going to fill this out, date and time, my partner's gonna, just uh, swab you left

to right, and then we're going to take you downstairs to see the judge, okay?"  Detective

McIntyre proceeded to read the entirety of the consent form to Defendant:  "I need you to write I

am Malik Smith, freely and voluntarily consent to an oral swab or blood DNA sample.  This

sample will be used by the Philadelphia Police Department for criminal investigative purposes.  I

understand that the detective has no search warrant authorizing this search and I have the

constitutional right to refuse permission for this search to be conducted.  Okay, do you

understand that?"  Defendant mumbled "yeah, I do" in response, and then signed the consent

form.  Another officer proceeded to swab the Defendant's mouth, and then escorted him out of

the interrogation room.

    At the suppression hearing, Detective McIntyre testified that at the time the swab was

taken the police had already collected DNA from the firearm recovered from Defendant's car.[3]

However, the police still needed the Defendant's DNA to determine whether his DNA was on

the firearm, which in turn would determine whether he had possessed the gun and/or the

ammunition loaded within.  Both Detective McIntyre and Special Agent Kyle Raguz of the

Federal Bureau of Alcohol, Tobacco and Firearms ("ATF") testified that had Defendant refused

to consent to the swab, the police would have applied for and obtained a search warrant to collect

---

[3] The record is not clear as to when exactly a DNA sample was collected from the recovered firearm.  Detective McIntyre testified that he believed that the firearm had been swabbed by the time Defendant was taken "downstairs."  The Government's brief in opposition to Defendant's motion to suppress evidence of his DNA states: "Officer Smith placed the firearm and ammunition on a property receipt.  Philadelphia Detective Jess Moulder swabbed the trigger guard and grip of the firearm for NA evidence and placed the swab on a property receipt."

his DNA—a process which takes approximately 2-4 hours.

Following the DNA collection, the Philadelphia Police Department's DNA Lab ("Philadelphia Lab") conducted a forensic analysis comparing the Defendant's DNA to the DNA found on the firearm.  A lab report issued on October 13, 2020 by the Philadelphia Lab could not determine whether the DNA from the recovered firearm matched that of the Defendant.  In the two months between the date of Defendant's arrest and the Philadelphia Lab's results, there were discussions about whether the Federal Government would adopt the case from state prosecutors. The U.S. Attorney's Office ultimately decided against doing so based on the Philadelphia Lab's determination that the DNA comparison was inconclusive.

Eight months later, on June 4, 2021, the DNA collected from the firearm and from the Defendant was submitted to the Bode Forensic Laboratory ("Bode Lab") for a second opinion. According to the Government's briefs, the Bode Lab's results indicated that the DNA mixture on the firearm was "at least 770 million times more likely to be observed if it originated from [Defendant] and three unknown, unrelated individuals than if from four unknown, unrelated individuals."  Sometime after the Bode Lab's results, the U.S. Attorney's Office adopted the case and secured a grand jury indictment against Defendant for being a felon in unlawful possession of ammunition.

On October 27, 2021, Special Agent Raguz testified that he obtained a search warrant from a Magistrate Judge to collect Defendant's DNA in advance of the hearing on these motions to suppress.  The affidavit in support of the search warrant application describes the facts and circumstances of the car stop on August 13, 2020 and references the federal grand jury's indictment of Defendant.  The warrant application does not mention that a sample of Defendant's DNA had already been taken and analyzed by two labs.  Special Agent Raguz executed the

search warrant the next day and collected the Defendant's DNA.  This second DNA sample has been submitted to the Philadelphia Lab for forensic analysis.  As of the date of the suppression hearing, the Philadelphia Lab had yet to determine whether the second DNA sample matched that collected from the firearm.

## II.    LEGAL STANDARD

The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause."  *United States v. Bey*, 911 F.3d 139, 144-45 (3d Cir. 2018).  "Warrantless searches and seizures"—such as the car search and buccal swab here—"are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies."  *Id.* at 145.

If a defendant believes that the Government's evidence was acquired by means of an unlawful search or seizure, he may file a pretrial motion to suppress the evidence.  To prevail, a defendant must first show that the search or seizure was conducted without a warrant.  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  The Government must then prove by a preponderance of the evidence that each individual act constituting the search or seizure was reasonable.  *See United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

If, the challenged search or seizure is found to be unlawful, then the exclusionary rule forbids the use of improperly obtained evidence at trial.  *Herring v. United States*, 555 U.S. 135,

139 (2009).  The exclusionary rule "reaches not only primary evidence obtained as direct result

of an illegal search or seizure, but also evidence later discovered and found to be derivative of an

illegality or 'fruit of the poisonous tree.'"  *Segura v. United States*, 468 U.S. 796, 804 (1984).

In his first motion, Defendant contends that both the stop of his car and the subsequent

retrieval of the loaded firearm violated his rights under the Fourth Amendment, and requests that

evidence of the recovered firearm and any evidence derived therefrom be excluded from

introduction at trial.  In his second, he challenges the validity of his consent to an oral DNA swab

because he had invoked his right to a lawyer.  His motions are addressed *seriatim*.

### III.    DISCUSSION

#### A.  The Recovery of the Firearm

A police officer's stop of a car, more commonly known as a "traffic stop," is a "seizure"

within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited

and the resulting detention quite brief."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  A

traffic stop is analogous to an investigative detention and has historically been reviewed under

the framework articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United

States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006).

Under *Terry* and its progeny, a police officer may conduct a "brief, investigatory" traffic

stop without violating the Fourth Amendment if there was a reasonable, articulable suspicion that

criminal activity is afoot, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), or that a traffic law had

been broken.  *See Delfin-Colina*, 464 F.3d 392 at 397 (citing *Whren v. U.S.*, 517 U.S. 806, 80

(1996)).  While the reasonable, articulable suspicion standard is "not readily, or even usefully,

reduced to a neat set of legal rules," its general parameters are settled.  *United States v. Sokolow*,

490 U.S. 1, 7 (1989) (internal citations and quotation marks omitted).  It is a "less demanding

standard than probable cause and requires a showing considerably less than preponderance of the evidence," *Wardlow*, 528 U.S. at 123, but still demands that a police officer "be able to articulate something more than an inchoate and unparticularized suspicion or hunch."  *Sokolow*, 490 U.S. at 7.  An officer must provide "specific, articulable facts" to justify a reasonable suspicion that an individual violated traffic laws.  *Delfin-Colina*, 464 F.3d at 397.  To determine whether the facts give rise to a reasonable suspicion, it is "imperative that the facts be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *See e.g.*, *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006) (quoting *Terry*, 392 U.S. at 21-22).  Considerations often included in the analysis include:  (1) the location of the stop; (2) the reputation of the area in which the stop occurred; (3) the time of day of the stop; and, (4) the Defendant's behavior.  *Id.* at 561.

The traffic law at issue in this case, Section 4524(e)(1) of the Pennsylvania Vehicle Code, prohibits the operation of "[a] motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle."  75 Pa. C.S. § 4524(e)(1).  In his briefing, Defendant concedes that the car's windows were tinted, but argues that they were not so tinted as to be unlawful.  He argues that he was stopped because he was "a black male operating a vehicle in a high crime area at night."

While racial profiling in policing has been found to violate the Constitution, *see, e.g.*, *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (holding New York City's "stop-and-frisk" program unconstitutional under the Fourth and Fourteenth Amendments because of its reliance on racial profiling against Black and Latino men); *Bailey, et al. v. City of*

*Philadelphia, et al.*, 2:10-cv-05952-JP (now settled class-action lawsuit between the City of

Philadelphia and class of Black and Latino men regarding the use of racial profiling in stop-and-

frisk practices), Fourth Amendment jurisprudence does not recognize a racially motivated traffic

stop as unconstitutional if the circumstances otherwise objectively justified a reasonable

suspicion that a traffic law had been broken.  The Supreme Court and Third Circuit have made

clear that an officer's subjective motivations for conducting a traffic stop are irrelevant.  *Whren*,

517 U.S. at 812-13; *United States v. Leal*, 235 Fed. App'x 937, 939 (3d Cir. 2007) ("[The

officer's] subjective motivation for initiating the stop is irrelevant.").  What matters, for the

purposes of the Fourth Amendment, is whether the circumstances of the stop give rise to an

*objectively* reasonable suspicion of a traffic violation.  *See Whren*, 517 U.S. at 812-13.  No traffic

violation need, in fact, have taken place.  So long as the officer held a particularized and

objective basis for suspecting a traffic violation, the stop will not offend the Constitution.

*Delfin-Colina*, 464 F.3d at 397-99; *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) ("To be

reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the

part of government officials, giving them 'fair leeway for enforcing the law in the community's

protection.'").

Accordingly, Officers Smith's and Gilliam's motives, racial or otherwise, would not

render their stop unconstitutional as long there was reasonable suspicion to believe Defendant

violated the traffic code.  *Id.*; *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (A

"technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an

investigation of some other crime.").  Here, the Government has sufficiently shown that the

officers had reasonable suspicion to believe that the car's windows were unlawfully tinted, and

the traffic stop did not violate Defendant's Fourth Amendment rights.  The record establishes

that both officers recalled Defendant's windows being tinted to such a degree of darkness that the officers could not see inside the car.  Moreover, Defendant was apprehended at night, on a relatively dark and dimly lit street.  The poor visibility conditions support the reasonableness of the officers' beliefs that the car's windows violated the traffic code.

Turning next to the officers' search of Defendant's car, Defendant contends that the search violated his rights because there was no search warrant and, in his view, no exception to the Fourth Amendment justifies the officers' search.  However, the officers' credible testimony warrants application of the plain view exception.  The plain view exception permits police officers to immediately seize a suspicious object that they perceive while engaging in lawful activity.  *United States v. Yamba*, 506 F.3d 251, 256-57 (3d Cir. 2007).  An object is in plain view if "[t]he general public could peer into the interior" and observe it; the angle or position from which an officer looks into the car is irrelevant.  *Texas v. Brown*, 460 U.S. 730, 740 (1983).  Moreover, the use of a flashlight to illuminate items in a car does not go past the limits of the plain view exception or otherwise offend the Fourth Amendment.  *Id.* at 739-40 ("The use of a searchlight . . . is not prohibited by the Constitution . . . the use of artificial means to illuminate a darkened area simply does not constitute a search and thus, triggers no Fourth Amendment protection.").

The officers lawfully stopped Defendant for a traffic violation.  During the stop, Officer Smith observed parts of a firearm, namely, an extended magazine and a portion of the tan-firearm bearing a "P-80" stamp, behind the front passenger seat.  Both officers provided unrebutted testimony that Officer Smith did not breach the car's interior by leaning through the window or opening the car's door.  Rather, Officer Smith could easily see a portion of the firearm through the open window.  Because the "plain view" exception permits an officer to

seize any suspicious objects they perceive, Officer Smith's recovery of the firearm did not

violate the Defendant's rights under the Fourth Amendment.  Accordingly, Defendant's motion

to suppress evidence of the recovered firearm recovered will be denied.

### B.  The DNA Collection

In his second motion, Defendant seeks to suppress the buccal swab of his DNA collected

on August 14, 2020.  He claims that his consent to the buccal swab, a search under the Fourth

Amendment, was ineffective because he had previously invoked his right to a lawyer and had not

been provided legal counsel before he was asked to give his consent.  *See Maryland v. King*, 569

U.S. 435, 446 (2013) (holding that a buccal swab to collect DNA constitutes a search under the

Fourth Amendment).  The Government counters that Defendant's consent was valid because the

Fifth Amendment's protections against self-incrimination do not apply to a consent to a search.

Rather, the Government contends that these protections extend to protect only "testimonial" or

"communicative" statements.  The Government further argues that even if the DNA sample was

unlawfully obtained, the evidence should not be excluded because the "inevitable discovery" and

"independent source" exceptions to the exclusionary rule apply.[4]

The Government's argument, however, misstates both the relevant legal framework and

the facts that must govern the analysis.  Beginning first with the applicable law, the

Government's point that the Fifth Amendment does not apply to an individual's decision to give

---

[4] Although it appears that the Defendant had been formally charged by the time he gave his consent to the DNA sample, neither party argues that the Sixth Amendment is applicable to this case.  *See Brewer v. Williams*, 430 U.S. 387, 398-99 (1977) ("[T]he right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. (internal citations and quotations omitted)); *United States ex rel. Daley v. Yeager*, 415 F.2d 779, 783 n. 7 (3d Cir. 1969) ("It matters not that defendant gave his statement before indictment.  It is the interrogation, in the absence of counsel, after the criminal proceeding has been commenced, whether by grand jury indictment or by a charge placed before a magistrate following an arrest, which is forbidden.'").  Accordingly, the applicability or not, as the case may be, of the Sixth Amendment is beyond the scope of this Court's decision.

consent is nothing more than a distraction from the real question at hand, namely, whether Defendant voluntarily consented to the search.  The Fourth, not the Fifth, Amendment instead supplies the answer.  The Fifth Amendment and its jurisprudential frameworks are not used to determine whether a suspect voluntarily consented to a warrantless search; the ultimate determination lies instead with the Fourth Amendment.  *Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981) (explaining that "the voluntariness of a consent or an admission [under the Fourth Amendment] on the one hand, and a knowing and intelligent waiver [of counsel under the Fifth Amendment] on the other, are discrete inquiries.").

The Fifth Amendment provides that, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To effectuate this promise to be free from compulsory self-incrimination, a person subjected to a "custodial interrogation"[5] must be advised of his rights to remain silent and to have an attorney present during questioning, and that any responses he provides may be used as evidence against him.  *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).  Once the rights to remain silent or the right to counsel are invoked, all interrogation must cease.  *Innis*, 4446 U.S. at 297-98.

The Fifth Amendment does not apply, however, to every investigative or prosecutorial wrong.  Indeed, Defendant's motion to suppress challenges whether his consent was willingly given, not whether the consent form violated his Fifth Amendment rights against self-

---

[5] A person is subjected to custodial interrogation when he is questioned by law enforcement officers after he has been taken into custody, *i.e.*, when he is formally arrested, or more generally, when his freedom of movement is restricted to "the degree associated with a formal arrest."  *Miranda*, 384 U.S. at 444; *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006).  Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 30001 (1980).

incrimination.[6]  To follow the Government's lead would not only go beyond the arguments made

by Defendant, it would also require wading into unclear legal waters and determining whether an

officer's request that a person in custody give consent to a search constitutes an interrogation,

whether the circumstances indicate that the consent form was "compelled" under the Fifth

Amendment, and whether a consent form constitutes a testimonial statement,[7] *compare Smith v.*

*Wainwright*, 581 F.2d 1149, 1151-52 (5th Cir. 1978) (holding that a consent to a search was not

a testimonial statement) *with Doe*, 487 U.S. at 217, 216 n.14 (noting that the compelled signing

of a consent form employing the language, "I, [witness], consent . . ." may be testimonial

because it may shed light on the signatory's state of mind) *and United States v. Fleming*, 31 F.

Supp. 2d 3, 5, 5 n.3 (D.D.C. 1998) (holding that the signing of a consent form can constitute a

testimonial action).

There is no reason to go down this difficult road when the Defendant asks the Court to

consider only his rights under the Fourth Amendment, and jurisprudence under this Amendment

provides a clear analytical path forward.  *Edwards*, 451 U.S. at 483-84.  To determine whether a

defendant's consent to a search was voluntary is determined under the "totality of

circumstances" test set forth in *Schneckloth v. Bustamonte*.  412 U.S. 218, 226-27 (1973).  The

Government has the burden of proving by a preponderance of evidence that the consent was

freely and voluntarily given.  *Id.* at 222; *Matlock*, 415 U.S. at 178 n.14.  The Government's

---

[6] Though Defendant's motion is not entirely clear, its most reasonable reading indicates that he means to challenge the lawfulness buccal swab only under the Fourth Amendment.  The heading to his argument reads that his "Fourth Amendment right to be free from unreasonable searches was violated . . ." and the arguments and cases cited therein pertain to the Fourth Amendment.  Nowhere in Defendant's motion is the Fifth Amendment expressly invoked, nor is the issue of self-incrimination ever mentioned. At most, the brief makes a passing reference to the Fifth Amendment by noting that the officers should have stopped questioning Defendant after he invoked his right to counsel.

[7] As the Government notes, the privilege against compulsory self-incrimination only protects a person from being incriminated by a compelled testimonial communication which is a communication that "itself, explicitly or implicitly, relate[s] a factual assertion or disclose[s] information."  *Doe v. United States*, 487 U.S. 201, 210 (1988).

burden will not be satisfied by "showing a mere submission to a claim of lawful authority." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983).)

In applying the *Schneckloth* test, courts must consider all of the factual circumstances surrounding the consent, which include:  (1) the characteristics of the defendant, such as his youth, his level of education, and his intelligence, *id.* at 226; (2) details of the interrogation, including whether the Defendant was advised of his constitutional rights, the length of the encounter, the nature of questioning, *i.e.*, whether it was repeated and prolonged, and the use of physical punishment, which includes the deprivation of food or sleep, *id.*; (3) the psychological impact of the circumstances on the accused, *id.*; (4) the context in which consent was obtained, *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009); and, (5) any verbal or nonverbal actions by the accused and the police officer[s], *id.*  No single criterion is dispositive; all the surrounding circumstances must be considered.  *Schneckloth*, 412 U.S. at 226.

The police officers' request for Defendant to give consent to a buccal swab mere minutes after he invoked his rights to remain silent and to an attorney is one factor that goes into the "totality of circumstances" calculus.  *See, e.g.*, *Smith*, 581 F.2d at 1152 ("The failure to cease questioning [after the suspect mentioned his attorney] would be a factor to be considered in 'the totality of all (of) the circumstances.'").  This factor weighs against a finding that Defendant's consent was voluntary.  Another strike against a finding of voluntariness is Defendant tiredness. By the time Defendant was asked to provide consent, he had been held in police custody overnight and for close to 16 hours.  Indeed, his fatigue was so noticeable that Detective McIntyre commented on it while appraising Defendant of his rights under *Miranda*.  On the other end of the scale, Defendant was advised by Detective McIntyre that the police did not have

a search warrant authorizing the buccal swab and that he had the constitutional right to refuse permission.

But Defendant's conversation with Detective McIntyre does not supply the entire universe of facts relevant to the *Schneckloth* analysis.  Rather, Detective McIntyre testified that someone had asked Defendant to consent prior to their conversation in the interrogation room. The Government has failed to put forth any evidence regarding that request for consent that supports its voluntariness, or indeed, otherwise sheds any light on the circumstances surrounding that interaction.  To prove that a warrantless search did not offend the Fourth Amendment, the Government must prove its lawfulness by a preponderance of evidence.  *Matlock*, 415 U.S. at 178 n.14.  The Government has failed to carry that burden.  It has failed to proffer any evidence on the "downstairs" encounter and failed to offer evidence to counteract the involuntariness of consent implicated by *inter alia* Defendant's invocation of his *Miranda* rights and his fatigue. For this reason, the Government has not shown that Defendant voluntarily consented to the buccal swab, and therefore, has failed to establish that the search was lawful

Accordingly, the exclusionary rule compels the suppression of any evidence of Defendant's DNA sample and the forensic analyses derived from it as the "tainted 'fruit' of unlawful government conduct."  *Nix v. Williams*, 467 U.S. 431, 441 (1984).  That is, of course, unless an exception applies.  The Government argues that both the inevitable discovery and independent source exceptions apply and permit the admission of the evidence at issue here.

The inevitable discovery exception provides that unlawfully obtained evidence need not be excluded from trial where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *Nix*, 467 U.S. at 444.  In *Nix*, the Supreme Court held that evidence of a murdered child's body was

admissible, even though it was found because of an unlawfully obtained confession, because testimony established that the body would have been found by a search party within hours of the defendant's confession. *Id.* at 444, 449-50. To meet its burden of proof, the Government cannot rely on speculation, but must provide "demonstrated historical facts capable of ready verification or impeachment. . . ." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (internal citations omitted).

This doctrine is designed to strike a balance between "the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding" and "society's interest in deterring unlawful police conduct." *Vasquez De Reyes*, 149 F.3d at 195. The Third Circuit has cautioned that "[i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *Id.* at 196.

Although the Third Circuit has not considered the application of the inevitable discovery doctrine where the Government claims that it could have obtained a warrant at the time of the illegal search, but did not actually do so, it has applied the inevitable discovery exception to admit evidence of a hard drive when the Government "attempted to secure state and federal search warrants at every step of the search." *See United States v. Stabile*, 633 F.3d 219, 246 (3d Cir. 2011). Consistent with the Third Circuit's reasoning, and guided by principles underlying the doctrine and the Supreme Court's analysis in *Nix*, courts have been reluctant to find that the inevitable discovery exception applies where the police were not in the process of obtaining a search warrant prior to, or failed to obtain one shortly after the illegal search. *See e.g.*, *United States v. Restitullo*, 215 F. Supp. 3d 343, 354-56 (D.N.J. 2016), *aff'd*, 796 Fed. App'x 76 (3d Cir. 2019) (expressing "special concern for the potential that the Government's post-hoc claims to the

existence of probable cause absent evidence of corresponding police efforts to obtain valid

search warrants erode the Fourth Amendment's warrant requirement."); *United States v.*

*Richardson*, 2007 WL 2823336, at *4 (W.D. Pa. Sept. 26, 2006) (declining to apply the

inevitable discovery exception where a police officer had not even begun the process to obtain a

warrant); *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994) (declining to apply the

inevitable discovery doctrine where there was no independent line of investigation or compelling

facts illustrating that the unlawfully seized guns would have inevitably been discovered); *United*

*States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998) ("The existence of probable cause for a

warrant, in and of itself and without any evidence that the police would have acted to obtain a

warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and

of itself, renders a warrantless search valid."); *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir.

2000) (holding that the exception did not apply to evidence seized during a search conducted

pursuant to the defendant's "consent," which was obtained because officers continued to

interrogate him after he asked for an attorney).

Applied here, the Government has not shown that the officers tried or were in the

process of obtaining a search warrant, or even obtained one shortly after the DNA collection.

*See Restitullo*, 215 F. Supp. 3d at 356-58.  Detective McIntyre's and Special Agent Raguz's

contentions that they would have applied for a search warrant had Defendant not consented are

exactly the kind of unacceptable assumptions or speculations which do not justify the application

inevitable discovery doctrine.  *See, e.g.*, *Richardson*, 2007 WL 2823336, at *4.  Although the

Government here eventually did obtain a warrant to lawfully acquire Defendant's DNA—over a

year after first sampling his DNA—the record clearly shows that it was obtained only so that it

could be presented at the suppression hearing.  This belated warrant is nothing more than a post-

hoc rationalization to "excuse the failure to obtain a search warrant where the police

had probable cause but simply did not attempt to obtain a warrant" at the relevant time. *Reilly*,

224 F.3d at 995.  Applying the inevitable discovery here would render the exclusionary rule and

the protections afforded by the Fourth Amendment a nullity whenever the evidence at issue is

permanent and unchanging, as in the case of DNA or some other type of bodily sample.  That

simply cannot be the case.  Evidence obtained from a person's body cannot hold a lower

protected status than other types of physical evidence simply because of its permanence.  *See,*

*e.g.*, *King*, 569 U.S. at 469 (Scalia, J., dissenting) (explaining that intrusions into the body must

be afforded equal weight as intrusions into the home under the Fourth Amendment).

 The second exception invoked by the Government, the independent source doctrine, also

does not apply.  The independent source doctrine allows for the admission of evidence that was

first observed or acquired unlawfully, but later acquired through an independent, lawful source.

*Murray v. United States*, 487 U.S. 533, 537-38 (1988).  The ultimate question to consider in

determining the applicability of this exception is "whether the search pursuant to warrant was in

fact a genuinely independent source of the information and tangible evidence at issue here." *Id.*

at 542.  Courts apply a two-factor test to answer this question, and consider:  (1) whether a

neutral magistrate would have issued a warrant authorizing the search "even if not presented with

information that had been obtained during the unlawful search," *United States v. Herrold*, 962

F.2d 1131, 1144 (3d Cir. 1992); and, (2) whether the agents' decision to seek the warrant was not

prompted by the initial unlawful search, *id.*; *Murray*, 487 U.S. at 542.   While the Government

satisfies the first prong because its application for the search warrant does not mention the initial

unlawful collection or the resulting DNA analyses, its case fails at the second prong.  Special

Agent Raguz testified that the decision to bring the case against the Defendant was based on the

conclusions of the Bode Lab's report, which in turn, depended upon the unlawfully collected DNA.  Moreover, Special Agent Raguz testified that he obtained a warrant to collect the Defendant's DNA only because the Defendant challenged its admissibility in his motion to suppress.  The decisions to bring the case and to secure a warrant authorizing the DNA search over a year after Defendant's initial arrest were "prompted" by the evidence acquired during the initial unlawful search.  A decision to the contrary would eviscerate the warrant clause of the Fourth Amendment and thwart the purpose underlying the exclusionary rule.  Accordingly, Defendant's motion to suppress evidence of his DNA sample and any evidence therefrom shall be granted.

## IV.    CONCLUSION

In light of the foregoing, Defendant's motion to suppress evidence of the firearm shall be denied, but his motion to suppress evidence of his DNA sample and evidence derived therefrom shall be granted.

An appropriate order follows.